# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION


JUDY K. VINCENT

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-0179

**ORDER**

_____


This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On May 25, 2006, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 15). The final decision of the Commissioner of Social Security is reversed and this matter is remanded for further proceedings.


## I. PROCEDURAL BACKGROUND

Plaintiff Judy Vincent applied for Supplemental Security Income benefits on December 28, 2001, alleging an inability to work since December 14, 2001 (Tr. 45-47; 61-70). Ms. Vincent's application was originally denied (Tr. 31-34), and denied again on reconsideration (Tr. 36-39; 257-260). A hearing before Administrative Law Judge (ALJ) John E. Sandbothe was held on March 25, 2004 (Tr. 265-290). The ALJ denied Ms. Vincent's appeal in a decision dated August 26, 2004 (Tr. 12-20). The Appeals Council denied Ms. Vincent's request for review on October 19, 2005 (Tr. 6-8). This action for judicial review was filed on November 22, 2005 (docket number 3).

## II.  FACTUAL BACKGROUND

### A.  Medical History

Ms. Vincent first saw Dr. Brooks, her rheumatologist, on June 1, 1992, for evaluation of her arthralgias and myalgias in her lower extremities (Tr. 196). Her joint exam revealed no active synovitis in her hands, wrists, elbows or shoulders (Tr. 197). She had normal range of motion in all of these joints (Tr. 197). There was questionable effusion in the left knee but none in the right and no warmth or erythema to either knee (Tr. 197). Range of motion in her cervical spine was normal and her strength was normal both proximally and distally (Tr. 197). Dr. Brooks' impressions included arthralgias and myalgias of uncertain etiology (Tr. 198). Ms. Vincent had some degenerative changes in her knees and to a slight degree in her feet (Tr. 198). However, her symptoms were out of proportion to the degree of degeneration (Tr. 198).

Ms. Vincent saw Dr. Brooks on July 16, 1992 for evaluation of her osteoarthritis and chronic pain syndrome (Tr. 194-95). Ms. Vincent's labs and x-rays revealed some mild osteoarthritis in the knees, predominately in the medial compartments in the patella femoral joints (Tr. 195). There was no significant change in her lower back or sacroiliac joints (Tr. 195). Laboratory tests revealed no evidence of a myopathy (Tr. 194-95). Her joint exam revealed some crepitation over the patella femoral joints with no active synovitis there or elsewhere (Tr. 194). Ms. Vincent had normal range of motion in her cervical spine, but she reported having headaches in the posterior cervical area and occipital region (Tr. 194).

Ms. Vincent saw Dr. Brooks on September 10, 1992 for evaluation of her osteoarthritis and chronic pain syndrome (Tr. 193). She had no peripheral synovitis, but there was some mild crepitation in her patellofemoral joints (Tr. 193). Neurologically, she had normal strength and reflexes in her upper extremities (Tr. 193).

Ms. Vincent saw Dr. Brooks on December 10, 1992 for evaluation of her osteoarthritis and fibromyalgia (Tr. 191). Her joint exam did not reveal any active synovitis and her knees revealed crepitation over the patellofemoral joints, but were

otherwise normal (Tr. 191). She had mild tenderness to the back of the neck and shoulders, as well as the lower back, but it seemed to be under control (Tr. 191).

Ms. Vincent saw Dr. Brooks on June 10, 1993 for evaluation of her osteoarthritis with fibromyalgia (Tr. 190). She reported having more problems with neck spasms and headaches, but her knees were feeling fairly good (Tr. 190). A joint exam revealed no active synovitis and her knees looked quite good (Tr. 190). Ms. Vincent did not have much in the way of tender points over the back of her neck and shoulders, which was her most significant complaint (Tr. 190).

Ms. Vincent saw Dr. Brooks on November 29, 1993 for evaluation of her fibromyalgia with chronic headaches (Tr. 190). She described her neck pain at this time as a constant aching sensation over the back of the neck and shoulders (Tr. 190). She had no peripheral synovitis, but was tender over the back of the neck and shoulders with good range of motion in the cervical spine (Tr. 190).

Ms. Vincent saw Dr. Brooks on May 25, 1994 for evaluation of her chronic pain syndrome (Tr. 188). She reported that she was feeling better in terms of depression, but was having more problems in terms of neck pain, headaches, and some degree of knee pain (Tr. 188). Her joint exam at this visit revealed no active synovitis, but she did have crepitation over the patellofemoral joints (Tr. 188).

Ms. Vincent saw Dr. Brooks on July 27, 1994 for evaluation of her chronic pain syndrome (Tr. 187). Ms. Vincent reported that she had been doing reasonably well since her last visit, but was still sleeping poorly at night and having chronic problems with intermittent neck and lower back pain (Tr. 187). Her joint examination revealed no peripheral synovitis and she had good range of motion in her cervical spine (Tr. 186-87). She had some tenderness in the paraspinal muscles of her neck and was mildly tender over the paraspinal muscles of her lower back (Tr. 186). Straight leg raising was negative (Tr. 186).

Ms. Vincent saw Dr. Brooks on November 1, 1994 for evaluation of her osteoarthritis with chronic pain syndrome (Tr. 185). Her joint examination revealed no active synovitis, but she was mildly tender between her second, third and fourth toes of her left foot proximal to the MTP joints and had no pain on compression of the MTP joints themselves (Tr. 185).

Ms. Vincent saw Dr. Brooks on February 28, 1995 for evaluation of her osteoarthritis with chronic pain syndrome (Tr. 184-85). Dr. Brooks' notes of this visit indicate that Ms. Vincent was doing well, both in terms of her pain and her depression (Tr. 185). Her joint examination revealed some mild swelling in the right knee, but no warmth or erythema, and she had normal range of motion in both knees (Tr. 185). She did have some crepitation in her patellofemoral joints (Tr. 185). Ms. Vincent admitted that she had not been doing her prescribed exercises, and Dr. Brooks told her to resume her exercises (Tr. 184).

Ms. Vincent saw Dr. Brooks on August 21, 1995 for evaluation of her osteoarthritis and chronic pain syndrome (Tr. 184). Ms. Vincent's joint symptoms and chronic pain syndrome were under reasonable control at this visit, notwithstanding some personal turmoil in her life (Tr. 184). Her joint examination revealed no active synovitis, but she was mildly tender over her upper back, shoulders, and lower back (Tr. 184).

Ms. Vincent saw Dr. Brooks on November 13, 1995 for evaluation of her osteoarthritis with chronic pain syndrome (Tr. 182-83). At this visit she complained of recently experiencing increasing pain and stiffness in her neck, to the point that she was unable to move her neck for a day or so (Tr. 183). As of the appointment her neck pain and stiffness was improved to the point where her movement was fairly well resolved and back to normal (Tr. 183). X-rays of her cervical spine revealed some degenerative changes in the C6-C7 and C7-T1 facet area of a mild degree (Tr. 183). The disc spaces were well maintained and the bones looked normal (Tr. 183). Ms. Vincent had no complaints of radicular-type symptoms down her arms or other radiation into her head or behind her eyes (Tr. 182). Her rage of motion in her cervical spine was fairly well

preserved in terms of actual movement, but she was stiff and somewhat tender in the neck and lower back (Tr. 182).

Ms. Vincent saw Dr. Brooks on February 15, 1996 for evaluation of her osteoarthritis with chronic pain syndrome (Tr. 181). Ms. Vincent's joint exam did not reveal any active synovitis, but there were mild degenerative changes in her hands and feet (Tr. 181). Ms. Vincent was tender over the left lateral epicondylar region and she complained that pain in that region had been a significant problem for her recently (Tr. 181). Ms. Vincent's range of motion in her cervical spine was only mildly decreased and there were no radicular pains with movement (Tr. 181). Ms. Vincent and Dr. Brooks discussed that Ms. Vincent might apply for Social Security disability, and Dr. Brooks opined that Ms. Vincent would have difficulty doing more than just sedentary type work and that any job that requires any strain to the neck or prolonged positioning of her neck in one position would probably be very difficult for her (Tr. 181). Dr. Brooks also noted that Ms. Vincent's depression probably plays a significant role in her ability to work as well (Tr. 181).

Ms. Vincent saw Dr. Brooks on August 19, 1996 for evaluation of her osteoarthritis with chronic pain syndrome (Tr. 179-80). Dr. Brooks did not appreciate any active synovitis or significant peripheral degenerative changes, but noted that Ms. Vincent still has significant pain on movement of her neck in all directions tested, although the movement passively is still well preserved (Tr. 180). Dr. Brooks reviewed Ms. Vincent's x-rays from the previous fall, which showed some mile to moderate degenerative changes in her neck (Tr. 179).

Ms. Vincent saw Dr. Brooks on November 13, 1997 for evaluation of her chronic pain syndrome with cervical spine pain associated with osteoarthritis (Tr. 178). Dr. Brooks' notes of this visit state that Ms. Vincent's neck pain "seems to be better, but she continues to have some degree of pain in the arms an diffusely in the back with increased activities" (Tr. 178). Dr. Brooks further noted no active synovitis on Ms. Vincent's joint exam, and only mild tenderness in the lateral epicondylar regions and

over the neck and shoulders (Tr. 178). She had good range of motion in her cervical spine and normal range of motion in her hips (Tr. 178). Dr. Brooks discussed with Ms. Vincent the need for regular exercise, including aerobic conditioning, which he suggested would help her fatigue (Tr. 178).

Ms. Vincent saw Dr. Brooks on February 14, 1997 for evaluation of her chronic pain syndrome (Tr. 177). During this visit Ms. Vincent reported having more problems with pain in her neck and occipital area (Tr. 177). Dr. Brooks did not notice any active synovitis on Ms. Vincent's joint exam, and noted that she has "full range of motion in her cervical spine with a normal neurologic exam in the upper extremities and only mild tightness to the muscles of her neck" (Tr. 177).

Ms. Vincent saw Dr. Brooks on May 13, 1997 for evaluation of her osteoarthritis with chronic pain syndrome (Tr. 176). Dr. Brooks' notes of this visit state that since Ms. Vincent's last visit, her "neck and occipital pain have settled down somewhat, although she continues to have difficulty in that area" (Tr. 176).

Ms. Vincent saw Dr. Brooks, on November 18, 1997 for evaluation of her chronic pain syndrome and osteoarthritis, especially in her neck (Tr. 175). Dr. Brooks' notes of this visit state that Ms. Vincent's neck and occipital pain are "still somewhat of a problem, but better than they were at the time of her last visit and better than most of the time that I have seen her" (Tr. 175). Ms. Vincent had no significant pain on movement of her neck on this day and her range of motion in her cervical spine was fairly normal (Tr. 165).

Ms. Vincent saw Dr. Brooks on November 8, 1998 for an evaluation of her osteoarthritis with involvement in the cervical spine along with chronic pain syndrome and depression (Tr. 174). Dr. Brooks' notes of this visit state that since Ms. Vincent's last visit, which was a year ago, she has been "feeling fairly good overall and has not had any major changes in her health history" (Tr. 174). Her general physical exam revealed no significant abnormalities (Tr. 174). Ms. Vincent's joint examination revealed mild degenerative changes in her hands and feet, but Dr. Brooks noted that she still has full range of motion in her cervical spine, despite the fact that she has degenerative changes

documented in the facet joints on x-ray (Tr. 174). Ms. Vincent's strength and sensation was within normal limits on all four extremities (Tr. 174).

Ms. Vincent saw Dr. Brooks on November 23, 1999 for an evaluation of her osteoarthritis with involvement in the cervical spine along with chronic pain syndrome and low-grade depression with insomnia (Tr. 171-172). Dr. Brooks' notes of this visit state that Ms. Vincent has continued to do reasonably well since her last visit and, "in general, has very few complaints today and indicates that the use of Lodine and cyclobenzaprine has controlled her symptoms fairly well" (Tr. 172). Dr. Brooks' notes further state that Ms. Vincent "has fairly good movement in her cervical spine with minimal degenerative changes in the hands and feet and mild tenderness on soft tissue examination" (Tr. 171).

Ms. Vincent saw Dr. Brooks again on November 21, 2000 for an evaluation of her chronic pain syndrome with osteoarthritis and a component of depression (Tr. 135). Ms. Vincent reported that she continued to have a fair amount of neck and shoulder pain and had a flare-up of increased symptoms more diffusely, as well as increased difficulty sleeping (Tr. 135). Dr. Brooks' notes state that he saw no "neurologic deficits or signs of significant increase in her degenerative disease (Tr. 134-135). Dr. Brooks did note, however, that Mr. Vincent had "typical tender points suggestive of fibromyalgia" (Tr. 134-135). He recommended regular exercise, the use of heat and various medications (Tr. 134-135). His notes state that he will see her in one year for a repeat evaluation (Tr. 134-135).

Ms. Vincent saw Dr. Brooks again on November 7, 2001 for an evaluation of her chronic pain syndrome with a degree of osteoarthritis and depression (Tr. 132). Dr. Brooks' notes of this visit state that Ms. Vincent reported that she continued to have a fair amount of stress at work, but was feeling reasonably well controlled over the last year, as compared to the previous year, and seemed to be doing well enough with her medications that Dr. Brooks did not want to make major changes (Tr. 132). Dr. Brooks' notes further state that he will see Ms. Vincent back in one year for follow-up, assuming she does well in the meantime (Tr. 132).

Ms. Vincent saw Dr. Brooks for a return visit on November 11, 2003 (Tr. 228). Ms. Vincent reported a flare of symptoms recently due to a change in weather and increase in depression (Tr. 228). Dr. Brooks' notes of this visit state that Ms. Vincent has diffuse musculoskeletal tenderness, but no significant progression of degeneration or swelling to her joints (Tr. 228). Dr. Brooks opined that Ms. Vincent should avoid lifting greater than 20 pounds, standing or walking for more than one hour at a time, should bend, squat, or kneel infrequently, and should change positions frequently (Tr. 230). Dr. Brooks further stated that Ms. Vincent's depression plays a significant role in her inability to work and exacerbates her fibromyalgia (Tr. 230).

## B.  Plaintiff's Subjective Complaints

On February 4, 2002, Ms. Vincent completed a daily activities questionnaire (Tr. 75-78) and a personal pain/fatigue questionnaire (Tr. 79-82). With respect to her activities of daily living, Ms. Vincent claimed that she had no problems with self-care, but that she had difficulty getting to sleep, getting back to sleep upon waking in the night, and difficulty getting up in the morning (Tr. 75, 81). She stated that she regularly does laundry, dishes, changes her sheets, takes out the trash, and mows the lawn, but rarely irons, vacuums, washes her car, rakes leaves, or does garden work (Tr. 75). Ms. Vincent explained that she has to pace herself when completing chores, that it takes her longer to complete chores, and that sometimes she has to take a pain pill (Tr. 75). She cooks daily, but only prepares frozen meals or leftovers in the microwave if she does not feel like cooking (Tr. 76). She goes grocery shopping once a week and runs errands such as banking as needed and without help (Tr. 76). She drives occasionally (Tr. 76). Ms. Vincent takes care of her cats in that she feeds and waters them, and changes their litter boxes. She takes her prescribed medications without help or reminders (Tr. 76). She experiences drowsiness when using muscle relaxers (Tr. 76). Ms. Vincent reads and does crossword puzzles daily (Tr. 77). She gardens infrequently and does not play much music (Tr. 77). She watches various television programs and is able to understand and remember the programs she watches (Tr. 77). Ms. Vincent infrequently meets friends and relatives

for meals (Tr. 77).  She has a little difficulty going out in public depending on her pain and fatigue (Tr. 77).  She goes to church occasionally (Tr. 77).  Ms. Vincent states that she has no problems getting along with other people and got along well with her former employers, supervisors, and coworkers (Tr. 77).  She explains, however, that her last job was very restrictive in that her employer did not want her to move around as she had been instructed to do by her doctor (Tr. 77).  As a result, she was regularly "talked to" for being out of her seat (Tr. 77).  Ms. Vincent states that she usually does not have problems concentrating or remembering, although it occasionally takes her a while to get her concentration in gear (Tr. 78).  She reacts to stress by getting nervous, experiencing neck pain, headaches, stiffness, and occasionally paces (Tr. 78).  She is able to pay bills and manage money (Tr. 78).

Regarding her personal pain and fatigue, Ms. Vincent states that she experiences aching pain all over, on a daily basis, and has frequent neck pain, headaches and stiffness (Tr. 79).  Weather changes, standing for extended periods of time, and not being allowed to change positions as needed makes her pain worse (Tr. 79).  She claims that her fatigue is constant, but is worse in the morning (Tr. 79).  Ms. Vincent was taking Vioxx, Hydrocodone, Cyclobenzapine, and Effexor for pain control, inflammation, muscle relaxation, and depression at the time she completed the questionnaire (Tr. 80).  She was doing some exercises to keep herself more limber, such as yoga and walking, and she uses a heating pad to help her back pain (Tr. 80).  Ms. Vincent states that her fatigue makes her just not want to do as much (Tr. 80).  She states that she can fight through the pain, but will pay for it later so she have to pace yourself (Tr. 80).  She further states that she can no longer do things that require much standing, and she cannot participate in activities such as aerobics or canoeing (Tr. 80).  Ms. Vincent claims that it is hard for her to stay in any one position for an extended period of time (Tr. 80).  She claims that too much writing or keyboarding causes hand and wrist pain and cramping (Tr. 81).  She states that she could probably lift 20-25 pounds, but not constantly (Tr. 81).  Ms. Vincent states that she would

stand in place for one hour, could walk for maybe two hours, and that her doctor advises that she move every 30 to 60 minutes (Tr. 82)

## C. Hearing Testimony

At the March 25, 2004 hearing, Ms. Vincent testified that she graduated from high school and attended Hamilton Business College (Tr. 268). Ms. Vincent testified that she has not been able to work since December 14, 2001, when she left her data entry job because her supervisors were not allowing her to follow doctors' instructions (Tr. 268). She claimed that the constant sitting and keying caused her a lot of neck and shoulder strain and caused her hand to go numb (Tr. 269). Her sleep problems relating to her fibromyalgia also caused her to be late to work (Tr. 269). She quit before she was terminated, but testified that the handwriting was on the wall (Tr. 269).

Since that time, Ms. Vincent testified that she still has lots of leg and knee pain, neck, wrist and finger pain, the site and severity of which vary on a daily basis, but is always there (Tr. 269, 270). Weather changes and extra activity make her pain worse (Tr. 269-70). Medication, wrist splints, pillows, heat and massage help with the pain, but nothing totally takes it away (Tr. 270). Ms. Vincent testified that she also experiences constipation, extreme exhaustion, and some double vision due to her fibromyalgia (Tr. 271). She also testified that she has trouble falling asleep, but once asleep she is able to sleep through for a period of time, although the sleep is not a very restful sleep (Tr. 272). Ms. Vincent claims that she has headaches that can last up to a couple of weeks at a time that start at the base of her head and cause her neck to stiffen (Tr. 273). The headaches and other fibromyalgia symptoms make it harder for her to concentrate, and Ms. Vincent testified that her memory is not what it used to be (Tr. 273).

With respect to her daily activities, Ms. Vincent testified that she is no longer able to do lengthy walking, aerobics, or garden anymore, but that she does do a little bit of yoga and leg lifting exercises to maintain flexibility (Tr. 274-75). Ms. Vincent testified that she sometimes naps during the day and there is no predictability as to the way her

symptoms affect her (Tr. 277).  She has one or two days per year where she actually feels like she has some energy (Tr. 277).

Ms. Vincent testified that she could comfortably lift maybe 20 pounds, could comfortably be on her feet for an hour, could sit comfortably in a work chair for maybe an hour, and could key for maybe an hour before needing a break (Tr. 281, 283).  She could sit again after a five minute break to get up and move around (Tr. 282).  Ms. Vincent testified that she could walk a city block or so before experiencing problems with her knees and feet (Tr. 282).  Weather changes cause her to be very achy and cause her arthritis and headaches to increase (Tr. 282).

The ALJ posed the following hypothetical to the vocational expert:

> [A] 52-year-old woman, 13 years education, past relevant work as noted in 15E.  She's been diagnosed with fibromyalgia, arthritis, depression, and she complains of constipation.  I would limit her in the following manner.  She could lift 20 pounds occasionally, 10 pounds frequently.  She could stand, walk, or sit one hour at a time, and could do each for a total of six hours.  She would need to alternate between standing and sitting every hour.  She could only occasionally balance, stoop, crouch, kneel, crawl, or climb.  She could do no continuous gross manipulation or fine manipulation.  And in that I mean under such circumstances such as factory work, or were that as the sole function of the job.  She would be limited in her ability to tolerate extremes of heat, cold, humidity, dust and fumes, no hazards.  I would limit her to simple, routine repetitive work at no more than a regular pace.

With these limitations, the vocational expert testified that Ms. Vincent could return to her past work of reference specialist, which is classified as unskilled sedentary work, with the opportunity to do some moving around (Tr. 287).  Her other past work would be precluded because they were classified as semiskilled (Tr. 287).

### D.  Competing RFCs

On January 15, 2002, Dr. Brooks wrote a letter to the Disability Determination Services Bureau (DDS) in reply to DDS' request for more information (Tr. 153).  In his letter, Dr. Brooks explained Ms. Vincent's diagnosis of fibromyalgia, and limited her to

jobs that do not require heavy lifting or carrying (Tr. 153). Specifically, he limited her to 20 pounds infrequently and 20 pounds frequently for lifting and carrying (Tr. 153). Dr. Brooks limited Ms. Vincent's standing to no more than one hour at a time and no more than four hours in an eight hour day (Tr. 153). Her sitting was limited to no more than one hour at a time, but could be resumed after a short period of stretching (Tr. 153). Dr. Brooks opined that stooping, climbing, kneeling and crawling should be done infrequently, and that exposure to extreme temperatures should be avoided (Tr. 153). Dr. Brooks finally opined that Ms. Vincent's exposure to hazardous conditions would be difficult because her reaction time is decreased (Tr. 153).

On February 12, 2002, Ms. Vincent was referred by DDS for a psychodiagnostic disability examination using the Mental Status Examination (Tr. 154-157). The psychological evaluation was conducted by Robert E. Hammer, Ph.D., Licensed Psychologist (Tr. 154-157). The purpose of this evaluation was to evaluate Ms. Vincent's activities of daily living, mental limitation for work-related activities, and her ability to handle cash benefits (Tr. 154). Dr. Hammer concluded that Ms. Vincent should generally be able to remember and understand directions (Tr. 156). She should be able to maintain attention an concentration in order to carry out directions, although maintaining pace will present problems (Tr. 156). Dr. Hammer opined that Ms. Vincent should be able to get along with supervisors, co-workers, and the public, that her judgment appears adequate, and that she should be able to make independent work decisions under general supervision (Tr. 156).

On March 28, 2002, clinical psychologist Dee E. Wright, Ph.D., completed a mental residual functional capacity assessment (Tr. 199-204). Dr. Wright concluded that Ms. Vincent was not significantly limited in her understanding and memory and only moderately limited in portions of her sustained concentration and persistence, i.e., her ability to carry out detailed instructions and her ability to maintain concentration for extended periods (Tr. 199). Dr. Wright further found that Ms. Vincent was not significantly limited in her social interactions or adaptations (Tr. 200). Dr. David A.

Christiansen, Ph.D., reviewed and affirmed Dr. Wright's assessment (Tr. 205-218). Dr. Christiansen found that Ms. Vincent was mildly limited in her activities of daily living and in maintaining social functioning (Tr. 215). He found that she was moderately limited in her ability to maintain concentration, persistence, or pace (Tr. 215).

On April 11, 2002, consultative physician Dr. Claude Koons, M.D., completed a physical residual capacity assessment of Ms. Vincent (Tr. 219-227). Dr. Koons opined that Ms. Vincent could lift and carry 20 pounds occasionally, 10 pounds frequently, could stand or walk at least two hours in an eight-hour workday, could sit about six hours in an eight-hour workday, but must periodically alternate sitting and standing to relieve pain or discomfort (Tr. 220). With respect to postural limitations, Dr. Koons opined that Ms. Vincent could occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 221). According to Dr. Koons, Ms. Vincent has no manipulative, visual, or communicative limitations (Tr. 222-23). Regarding environmental limitations, Dr. Koons suggested that Ms. Vincent should avoid concentrated exposure to extreme heat and cold, but was otherwise unlimited (Tr. 223). In his review summary, Dr. Koons found that Ms. Vincent's allegations were credible and consistent with her diagnoses, but that she would still be capable of working consistent with his RFC (Tr. 227).

On June 19, 2002, Dr. Brooks completed a fibromyalgia residual functional capacity questionnaire provided by Ms. Vincent's attorney (Tr. 160-163; 261-264). Dr. Brooks stated that Ms. Vincent meets the American Rheumatological criteria for fibromyalgia, and that she has depression and mild osteoarthritis (Tr. 160; 261). Her prognosis was stable (Tr. 160; 261). Dr. Brooks identified Ms. Vincent's symptoms as multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, irritable bowel syndrome, and depression (Tr. 160; 261). Dr. Brooks stated that Ms. Vincent experiences chronic, aching pain with fatigue in her lumboasacral spine, her cervical spine, her thoracic spine, her chest, her shoulders, her arms, her hands and fingers, her hips, her legs, and her knees, ankles, and feet (Tr. 161; 262). Changing weather, cold, stress, fatigue, static position, and movement/overuse precipitate Ms. Vincent's pain (Tr. 161;

262). Dr. Brooks opined that Ms. Vincent is not a malingerer, but that emotional factors do contribute to the severity of her symptoms and functional limitations (Tr. 161; 262). According to Dr. Brooks, Ms. Vincent's physical impairments, plus any emotional impairments, are reasonably consistent with her symptoms and functional limitations described in the evaluation (Tr. 161; 262). Dr. Brooks opined that Ms. Vincent's pain would often be sufficiently severe to interfere with attention and concentration, and that Ms. Vincent is slightly limited in her ability to deal with work stress (Tr. 161; 262). Ms. Vincent experiences drowsiness and upset stomach as a side effect of her medications (Tr. 161; 262). Dr. Brooks stated that Ms. Vincent was unable to work a normal eight-hour day as of her last visit in November 2001, although she is expected to have "waxing and waning" symptoms (Tr. 162; 263). Dr. Brooks opined that Ms. Vincent could walk three city blocks without rest or severe pain, could sit and stand for one hour at a time, would need to include periods of walking during an eight-hour work day, i.e., walk for five minutes every 90 minutes (Tr. 162; 263). Dr. Brooks further stated that Ms. Vincent would need a job which permits shifting positions at will from sitting, standing or walking, and that she would need to sit at least six hours in an eight-hour work day and stand/walk for about four hours total (Tr. 162; 263). Infrequently, Ms. Vincent may need to lie down at unpredictable intervals during a work shift (Tr. 162; 263). Dr. Brooks opined that Ms. Vincent could lift and carry up to 10 pounds frequently, 20 pounds occasionally, and never 50 pounds (Tr. 163; 264). Ms. Vincent has no significant limitations in reaching, handling or fingering, but should limit her grasping, turning, and twisting objects to 25% of a workday, fine manipulations of her fingers to 25% of a work day, and reaching her arms to 25% of a work day (Tr. 163; 264). Ms. Vincent is able to occasionally bend and twist at the waist (Tr. 163; 264). Dr. Brooks finally opined that Ms. Vincent would be absent from work about one day per month due to her impairment or treatment (Tr. 163; 264).

On July 2, 2002, Dr. Brooks completed a "Report on Incapacity" form concerning Ms. Vincent, wherein he diagnosed Ms. Vincent as suffering from fibromyalgia and osteoarthritis (Tr. 158-159). Dr. Brooks noted that Ms. Vincent is seen yearly for these conditions, both of which are permanent, and that she suffers from mild depression (Tr. 159). Dr. Brooks opined that Ms. Vincent is not able to return to her usual employment and recommended that she apply for long-term disability benefits (Tr. 159).

On March 23-24, 2004, Dr. Roof, Ms. Vincent's treating family physician since 1988, completed a physical residual functional capacity questionnaire form provided by Ms. Vincent's attorney, and wrote a letter outlining Ms. Vincent's capabilities (Tr. 231-237). Dr. Roof stated that Ms. Vincent's pain and symptoms would rarely be severe enough to interfere with her attention and concentration needed to perform even simple work tasks, and that Ms. Vincent was capable of working a low stress job (Tr. 234). Dr. Roof opined that Ms. Vincent was not a malingerer, but that her depression does contribute to the severity of her symptoms and functional limitations (Tr. 234).

## II.  CONCLUSIONS OF LAW

### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial

evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

(1)     If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3)     If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)     If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)     If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ found that Ms. Vincent had not engaged in substantial gainful activity since her alleged onset date of December 14, 2001 (Tr. 19). At the second and third steps, the ALJ determined that Ms. Vincent has severe fibromyalgia, arthritis and depression, but that she does not have an impairment or combination of impairments listed in nor medically equal to one of the listed impairments (Tr. 19-20). At the fourth step, the ALJ determined that Ms. Vincent's past relevant work as a reference specialist did not require the performance of work-related activities excluded by Ms. Vincent's impairments, and that Ms. Vincent's impairments do not prevent her from performing her past relevant work (Tr. 20). Therefore, the ALJ determined that Ms. Vincent was not disabled.

## C.  Treating Physician

Ms. Vincent argues that the ALJ's conclusions regarding her RFC are inconsistent not only with the opinions of her treating physicians, Drs. Brooks and Roof, but are also inconsistent with the opinions of the state agency medical consultants. While the ALJ summarized Dr. Brooks' reports from January 2002, June 2002, and January 2004, Ms. Vincent argues, the ALJ failed to specifically reject Dr. Brooks' opinions and failed to identify any good reasons to reject Dr. Brooks' opinions. Moreover, the ALJ failed to even acknowledge or summarize the opinions from Dr. Roof regarding the nature and severity of Ms. Vincent's condition. Specifically, Ms. Vincent takes issue with the ALJ's finding that she was able to stand and walk for six hours a day. The consultative

physicians limited Ms. Vincent to standing and walking for two hours in a workday. Ms. Vincent contends that remand is necessary for further consideration of the opinions of Drs. Brooks and Roof.

The Commissioner argues that the ALJ's conclusions were, in fact, consistent with Dr. Brooks' opinions except for the four-hour daily limit on standing and walking. This inconsistency is irrelevant, however, because Ms. Vincent's past relevant work as a reference specialist was sedentary and, therefore, did not require standing and/or walking for four or six hours during a work day. As Ms. Vincent testified, she was allowed "a considerable amount of freedom of movement" in her reference specialist position, but that she was primarily sitting when performing that job. Dr. Brooks' July 2002 opinion that Ms. Vincent could not return to her "usual employment" referred to her most recent job as a data entry clerk, not the reference specialist position. The Commissioner contends that the ALJ did not err in failing to discuss evidence from Dr. Roof, as Dr. Roof did not place any specific limitations on Ms. Vincent's activities. The Commissioner concedes that the ALJ could have done a better job of discussing the medical evidence, but argues that his findings should not be set aside because the deficiency had no practical effect on the outcome of the case.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating

physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

The court has reviewed the ALJ's findings and compared them to the conclusions of Drs. Brooks and Roof. The only inconsistency is the ALJ's finding that Ms. Vincent could stand and/or walk for a total of six hours during a normal eight-hour work day (Tr. 20). Dr. Brooks opined that Ms. Vincent could stand and/or walk up to four hours during an eight-hour work day (Tr. 153, 162). The ALJ could and should have set forth in his decision his rationale for varying from Dr. Brooks' opinion regarding Ms. Vincent's ability to stand and/or walk. However, as the Commissioner points out, Ms. Vincent's past relevant work as a reference specialist was a sedentary position and, therefore, did not require standing and/or walking for four or six hours during a work day. Moreover, Ms. Vincent admitted that she was allowed "a considerable amount of freedom of movement" in her reference specialist position. The court will not reverse the ALJ's decision on this ground.

### D. Credibility Determination

Ms. Vincent next argues that the ALJ erred in finding her subjective complaints not credible under Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984). Ms. Vincent claims that the ALJ, under the guise of a credibility finding, substituted his judgment for that of the treating physicians, and used only three sentences for his Polaski analysis. Ms. Vincent contends that her daily activities are not inconsistent with her claim of disability, and that the ALJ erred in ignoring evidence from Ms. Vincent, her doctors, her former employer, and third parties concerning her ability to work in a competitive setting, i.e., consistent tardiness due to chronic fatigue. Ms. Vincent further argues that her work history suggests that she is used to working and is willing to continue working should her

health allow. Finally, Ms. Vincent claims that the ALJ failed to recognize the interplay between her physical and mental conditions, i.e., Dr. Brooks' opinion that emotional factors contributed to the severity of Ms. Vincent's symptoms and functional limitations, and that the ALJ erred in failing to consider the side effects of her narcotic and other medications, such as daytime fatigue, drowsiness, and stomach upset.

The Commissioner argues that the ALJ appropriately evaluated Ms. Vincent's subjective complaints. The Commissioner then cites to ample evidence in the record which could have supported the ALJ's credibility determination. However, there is no indication from the ALJ's decision that he actually considered the evidence cited in the Commissioner's brief as part of his Polaski analysis. Rather, the ALJ merely stated that Ms. Vincent was not credible because she can care for herself and her living quarters, her functioning is poor in the morning but improves as the day progresses, and her medications have been effective when she has been able to afford to take them.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Id. In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id. at 1321-22. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

However, "a claimant need not prove that he or she is bedridden or completely helpless to be found disabled." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). See also Keller v. Shalala, 26 F.3d 856, 859 (8th Cir. 1994) (finding it error to discredit the claimant's subjective complaints of pain based on her daily activities which consisted of watching television, taking care of her dogs, and doing household chores, which claimant testified she could not do when she was suffering from a disabling headache); Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) ("We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" (citing McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard complaints "solely because the objective medical evidence does not fully support them." Polaski, 739 F.2d at 1322. Furthermore, "[t]he [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations."

In this case, the court agrees with Ms. Vincent that the ALJ's cursory and conclusory credibility analysis does not satisfy Polaski. Clearly, the ALJ knows the appropriate standard, as it encompasses nearly an entire page of his decision (Tr. 17). The ALJ did not apply the standard, however, to the facts of Ms. Vincent's case. Remand is appropriate so that the ALJ can do a thorough credibility determination, taking into account the Polaski factors, as well as those set forth in the SSR 96-7p and 20 C.F.R. §§ 404.1529 and 416.929.

### E.  Residual Functional Capacity

Ms. Vincent's final argument is that the ALJ did not closely match the requirements of her past work as a reference specialist with her residual functional capacity. Specifically, Ms. Vincent contends that the ALJ erred in comparing her job as a reference specialist to that of a call-out operator, as her past work was not in the field of financial

services, required almost constant use of her hands, required technical skills, and required that she write reports. Rather, Ms. Vincent argues, her job as a reference specialist is closer to that of an employment clerk, which is a skilled job and requires technical knowledge, and frequent handling and fingering. Ms. Vincent claims that the ALJ failed to "fully investigate" her past work and instead found that she could return to a job that is significantly different from the work she actually performed.

The Commissioner contends that the ALJ's step four finding was proper and supported by substantial evidence. The Commissioner points out that Ms. Vincent described her past relevant work as a reference specialist as "mostly" using her phone skills to verify information in student truck driver employment applications. She carried nothing heavier than file folders, sat most of the day, and hand wrote most of the day with occasional use of a computer.

When she completed her work history report (Tr. 83-90), Ms. Vincent checked boxes in the affirmative indicating in her reference specialist position that she used machines, tools or equipment, used technical knowledge or skills, and wrote reports or completed forms (Tr. 85). She described this position as "mostly" using phone skills to verify applications, handwriting all day, and occasionally using computers (Tr. 85). At the hearing, Ms. Vincent testified that her reference specialist position primarily involved sitting, being on the telephone, and a lot of handwriting (Tr. 286). Her job was to verify student truck driver applications for work with a local trucking company (Tr. 286).

The court does not find that the ALJ erred in finding that Ms. Vincent was able to return to her past relevant work as a reference specialist. As Ms. Vincent described this job at the hearing, it did not require technical skills or that she write reports. The call-out operator position is not inconsistent with Ms. Vincent's past work as a reference specialist. The court will not disturb the ALJ's analysis or findings in this regard.

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is reversed and this matter is remanded for a thorough and detailed evaluation and analysis of Ms. Vincent's credibility, as set forth above.

August 8, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT